1
2
3
4
5
6
7
8
9

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIANA NELSON, on behalf of herself and all others similarly situated,<br><br>                                    Plaintiff,<br><br>          vs.<br><br>STANDARD INSURANCE COMPANY, an Oregon company; COUNTRYWIDE FINANCIAL CORPORATION GROUP LONG TERM DISABILITY PLAN; COUNTRYWIDE FINANCIAL CORP., and DOES 1-50, inclusive,<br><br>                                    Defendants. | CASE NO. 13cv188-WQH-MDD<br><br><br>ORDER |

HAYES, Judge:

The matters before the Court are 1) the motion for summary judgment and judicial notice (ECF No. 68) filed by Plaintiff Mariana Nelson; and 2) the motion for summary judgment (ECF No. 69) filed by Defendant Countrywide Financial Corporation Group Long Term Disability Plan.

## BACKGROUND

Plaintiff Nelson initiated this action by filing a Complaint against Defendants Standard Insurance Company, Countrywide Financial Corporation Group Long Term Disability Plan ("Countrywide Plan"), and Countrywide Financial Corporation. The Complaint asserted the following causes of action: (1) Class Action Claim for Benefits pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29

U.S.C. § 1132(a)(1)(B) against the Countrywide Plan; (2) Class Action Claim for Equitable Relief pursuant to ERISA, 29 U.S.C. § 1132(a)(3) against all Defendants; (3) Class Action Breach of Fiduciary Duty pursuant to ERISA, 29 U.S.C. § 1104(a)(1) against all Defendants; (4) Class Action Declaratory Relief against all Defendants; and (5) Individual Claim for Benefits pursuant to ERISA, 29 U.S.C. § 1132(a)(1)(B) against Defendant Countrywide Plan.

On July 17, 2013, the Court granted a motion to dismiss the Complaint filed by Defendants.  (ECF No. 23).  The Court concluded that the Complaint relied upon a violation of Cal. Ins. Code § 10144 and that Section 10144 did not require insurers to offer equal benefits for both mental and physical disabilities.

On October 31, 2013, Plaintiff Nelson filed an Amended Complaint alleging the same five claims against the same three Defendants.  (ECF No. 31).

On February 21, 2014, the Court filed an order granting the motion to dismiss Claims 1-4 of the First Amended Complaint by Defendants for the reasons stated in the July 17, 2013 order and denying the motion to dismiss Claim 5 of the First Amended Complaint against Defendant Countrywide Plan.  (ECF No. 39).

On August 26, 2014, the Court filed an order denying motion for judgment on the pleadings on Claim 5 of the First Amended Complaint filed by Defendant Countrywide Plan.  The Court concluded that Defendant Countrywide Plan was not entitled to judgment on the pleadings on Nelson's Individual Claim for Benefits pursuant to ERISA, 29 U.S.C. § 1132(a)(1)(B) in Claim 5 on the grounds that the claim was untimely.  (ECF No. 61).

On August 3, 2015, Plaintiff Nelson filed a motion for summary judgment and judicial notice.[1]  (ECF No. 68). Nelson moves for summary judgment as follows: 1)

---

[1] Plaintiff moves the court for judicial notice of the fact that "Narcolepsy"; "Parasomnia"; "Periodic Limb Movement"; and "REM-related Behaviorial Disorder" are "neurologic disorder(s)."  Defendant objects to the request.  "Neurologic diseases" is a term used in the Policy and material to resolve the dispute between the parties.  The facts at issue are contested as they apply to the terms of the Policy.  In this case, the requested notice of fact is not a proper subject for judicial notice under Rule 201.

Defendant Countrywide Plan abused its discretion in denying continuing benefits to Nelson, 2) Nelson is entitled to benefits from December 31, 2009 until the present, 3) Nelson is entitled to benefits beyond any two year limitation, and attorney fees.  In addition, Nelson requests Judicial Notice of certain facts.  (ECF No. 68-10).

On August 24, 2015, Defendant Countrywide Plan filed a motion for summary judgment.  (ECF No. 69).  Defendant Countrywide Plan moves the Court for summary judgment in its favor that the decision to close Nelson's claim is supported by substantial evidence,  reasonable and permissible, and not an abuse of discretion.

## FACTS

Beginning in January 2004, Nelson was employed as a loan officer with Countrywide Financial Corp.  Nelson received long term disability coverage under the Countrywide Financial Corporation Group Long Term Disability Plan, policy number 643382 ("the Policy"), issued by Standard Insurance Company ("Standard").  Nelson stopped working due to disability in April 2007.

On May 21, 2008, Nelson submitted an Employee Statement to Standard seeking long term disability benefits listing April 1, 2007 as the date she became disabled.  (ECF No. 69-2 at 127).  Nelson stated, "I am constantly sleep deprived.  I can only stay awake 10-14 hours a day - and I nap about every 2 hours.  When I force myself to stay awake during the day - after about a week,  I am so sleep deprived that all I can think about is suicide because doing anything else feels impossible." *Id*.  Nelson supported her claim with statements from Justin Birnbaum, M.D., a psychiatrist, and Sheila Tobin Black, Ph.D., a psychologist. Dr. Birnbaum listed Nelson's diagnosis as "Major Depressive Disorder" with symptoms including "depressed mood, anhedonia, low energy, poor concentration, difficulty sleeping, suicidal ideation."  (ECF No. 69-2 at 107).  Dr. Black listed Nelson's diagnosis as "Major Depressive Disorder" with symptoms including "depressed mood, significant weight gain, hypersomnia, psychomotor agitation, chronic fatigue." (ECF No. 69-2 at 128).

On June 3, 2008, a representative from Standard spoke to Nelson by telephone.

The Memorandum by the representative from Standard stated,

> [Nelson] said that she sees Dr. Black every Tuesday. She also is seen for sleep issues at Stanford. She said she has seen them since 2000. She said CPAP [Continuous Positive Air Pressure] has failed and they are looking at a neurological basis for her sleep issue. She said she is only able to be up for 5-6 hours per day. She also states, however, that at times she'll become so sleep deprived that the depression gets really bad and she becomes suicidal. She advises she was hospitalized at the Stanford Psych Hospital in January for three weeks because of this.

(ECF No. 69-4 at 106).

On June 5, 2008, Standard requested Nelson's records from Dr. Black and Stanford Hospital and Clinics. (ECF No. 72-1 at 7).

On June 25, 2008, Standard received a Physician's Supplementary Certificate signed by Dr. Black and dated February 5, 2008 that had been submitted to the California Employment Development Department in relation to Nelson's claim for state disability insurance benefits; a letter dated January 13, 2008 from Dr. Black to the Medical Director at Stanford's Sleep Disorders Clinic; and a letter from Dr. Black to the leave of absence coordinator at Countrywide dated June 20, 2008. (ECF No. 69-11 at 7, 9, 10). The letter dated June 20, 2008 from Dr. Black states in part "I have been treating Ms. Nelson for Major Depressive Disorder and Generalized Anxiety Disorder, both strongly exacerbated by severe sleep deprivation (with probable underlying biological cause) regularly since 12/08/05." *Id.* at 7. The Physician's Supplementary Certificate dated February 5, 2008 states in part: "Pt. is chronically sleep-deprived and suffers extraordinary physical fatigue and diminished mental focus . . . A recent life-threatening episode of depressions and suicidal ideation . . . led to a 2-week psychiatric inpatient residency." *Id.* at 9. The Certificate noted "Major Depressive Disorder, Recurrent, Severe w/o psychotic features . . . Breathing-related Sleep Disorder (Sleep Apnea Syndrome)." *Id.* The letter to the Medical Director at Stanford's Sleep Disorders Clinic dated January 13, 2008 states in part:

> [Ms. Nelson] is a patient at your clinic for the third time. Most recently, Drs. Christian Guilleminault and Stephen Brooks saw her. Unfortunately, with each of these experiences the attending physicians' attention to her debilitating difficulties seems to have been inconsistent and apathetic relative to her lifelong sleep history and current incapacity.

> Ms. Nelson was hospitalized in June 2007, and again last week, both times with my encouragement, she having exhibited persistent suicidal ideation and dangerous behavior due to prolonged exhaustion from sleep deprivation.  She has had to go on disability from work (see attached letter).
>
> There is no doubt that, in addition to her myriad sleep difficulties, Ms. Nelson suffers from a mood disorder.  She clearly fits the criteria for Dysthymic Disorder, has a number of Borderline Personality features, and could suffer from atypical Bipolarism. I don't know which "evil" (chronic sleep disturbance or psychiatric instability) is primary. . . .

*Id.* at 10.  The attached letter signed by Dr. Black dated December 21, 2007 and addressed to the leave of absence coordinator at Countrywide states in part: "Ms. Nelson remains in a chronic state of disability to perform her normal work activities, due to extreme mental and physical fatigue.  I am treating her for depression and anxiety resulting from a crippling sleep disorder, yet unnamed and currently being investigated by the medical community at Stanford Hospital. . . ." *Id.* at 11.

On July 9, 2008, Esther Gwinnell, M.D., a consulting physician in psychiatry for Standard, reviewed the available records and prepared a written report for Standard stating in part,

> [a]lthough the information is sketchy, it does appear that Ms. Nelson has a substantial degree of depression.  Based on Dr. Black's narrative, it is reasonable that Ms. Nelson has been unable to function in her own or any other occupation beginning April 1, 2007, through June 2008, and beyond.

(ECF No. 69-10 at 101).

On July 10, 2008, Standard accepted the claim and paid Nelson disability benefits.  (ECF No. 69-2 at 81-84).

On July 14, 2008, Standard notified Nelson that

> [t]he information in your file supports that you are Disabled by one or more conditions, including depression and anxiety.  Since depression and anxiety are considered to be mental disorders, we will apply the Mental Disorders Limitation to your claim. . . We will review your claim on an ongoing basis to determine if you are Disabled by other conditions which are not subject to Limitation.  If we determine that you are Disabled by other conditions which are not subject to Limitation, you may continue to receive LTD Benefits after the 24 month Maximum Benefit Period for your Limited Condition(s) is over.

(ECF No. 69-2 at 72-73).

On December 24, 2008,  Standard received Nelson's medical records from the

Stanford Hospital and Clinic. (ECF No. 69-9 at 54).

On February 15, 2009, William Herzberg, M.D., Neurology wrote a Physician Consultant Memo at the request of Standard. (ECF No. 69-9 at 40-44). Dr. Herzberg reviewed the records in Nelson's claim file, including the Stanford medical records, and the statement and letters by Dr. Black. Dr. Herzberg reviewed the records from the Stanford Sleep Disorder Clinic, including the polysomnogram summary done on May 20, 2007 and the report written by Dr. Robinson in the Stanford records, as well as the Stanford records for psychiatric care. Dr. Herzberg concluded "Ms. Nelson has longstanding depression with multiple suicide attempts over the years since childhood and documented obstructive sleep apnea syndrome." *Id.* at 42. In the Responses to Questions, Dr. Herzberg stated in part,

> *Does the medical documentation received support that Ms. Nelson has an underlying sleep disorder which is separate and distinct from any sleep issues attributable to her depression?*
>
> Yes, she does have documented obstructive sleep apnea syndrome. . . .
>
> *What limitations and restrictions, if any, would be associated with the sleep symptomatology alone?*
>
> A fairly high portion of the general population has obstructive sleep apnea syndrome of this severity or greater. . . . For this degree of sleep apnea as documented I do not think there needs to be any associated limitations or restrictions.
>
> *If she experiences limitations and restrictions as a result of her sleep symptoms, when would you anticipate an appreciable change in her status, and what would be your recommendation for future medical followup?*
>
> Based on how mild Ms. Nelson's sleep apnea is, I would venture to say that most of her sleep symptoms are referable to her depression and not to her intrinsic sleep disorder. Her change in status will likely follow improved treatment of depression.

*Id.* at 43.

On August 3, 2009, Nelson was evaluated by Inchel C. Yeam, M.D. at the Pacific Sleep Lab. Dr. Yeam took a history of Nelson's present illness and stated "at this point it is not clear what is going on. It is possible that she may have some underlying parasomnias as well as REM-related behavior disorder. Some of the symptoms she describes may be consistent with narcolepsy. However, she denies any cataplectic

attacks." (ECF No. 69-9 at 5). Dr. Yeam ordered an overnight sleep study to further clarify the nature of Nelson's sleep pathology. After the sleep study, Dr. Yeam noted his impression as "Probable narcolepsy. Parasomnia." *Id.* at 1. Dr.Yeam noted "features of REM-related behavioral disorder as well as other parasomnias," prescribed medication, and recommended follow-up in three weeks. *Id.* at 3. The claim file notes a received stamp of September 28, 2009 for the records of Dr. Yeam.

On September 28, 2009, Standard received additional records from Stanford Hospitals and Clinics. (ECF No. 69-7 at 61).

On October 10, 2009, Dr. Herzberg wrote a second report after reviewing the file again, the information from Dr. Yeam, and the additional Stanford records. (ECF No. 69-7 at 47). Dr. Herzberg summarized,

> Ms. Nelson has a complicated sleep history. As recently as Janaury 31, 2008, I can state with confidence through her Stanford evaluation that she does not have narcolepsy nor excessive daytime sleepiness. She does have sleep-disturbed breathing at that point with either upper airway resistance syndrome or mild sleep apnea, depending on the night of her studies, this following her upper airway reconstructive surgery. . . . It would seem likely, given the mild severity of her documented sleep studies to this point, that most of her daytime sleepiness can be attributed to mood disorder with related sleep disorder.
>
> Subsequent to her Stanford evaluation with Dr. Yeam in San Clemente, the picture changes. There is no evidence of sleep apnea nor upper airway resistance, and she does have either 2 or 3 sleep onset REM periods on her MSLT with unusual behavior emerging from sleep.
>
> I am inclined to trust the information from Stanford more than the information from Dr. Yeam's evaluation. The Stanford evaluation is more thorough, includes esophageal manometry and his MSLT was nonstandard with only 3 naps noted and without mention of urine tox screen or log preceding the sleep study of medications. However, in the year and a half since her Stanford evaluation, it is conceivable, although unlikely, that Ms. Nelson developed REM-related behavioral disorder as well as possible narcolepsy. I think a likelier explanation is a medication effect.

*Id.* at 49-50. When asked whether the additional information altered his previous opinions that most of Nelson's sleep symptoms are referable to her depression, Dr. Herzberg responded "the information from Stanford does not alter the assessment. The information from Dr. Yeam is discrepant, and I do not know if it is as valid as the serial evaluations done through the Stanford system." *Id.* at 50. Dr. Herzberg further stated,

1   "I am not convinced that Ms. Nelson's most recent PSG/MSLT is a valid descriptor of
2   her condition, but if it were valid, then she should not drive nor operate heavy
3   machinery until adequately treated with stimulant medications." *Id.*

4   On October 16, 2009, Nelson applied for social security benefits describing the
5   conditions that limit her ability to work as "sleep apnea, periodic limb movement
6   disorder, restless leg syndrome, narcolepsy, depression." (ECF No. 69-13 at 23).

7   On January 4, 2010, Standard informed counsel for Nelson that LTD benefits
8   have been terminated as of December 31, 2009 because "she has exhausted benefits
9   payable to her for her Mental Disorder." (ECF No. 69-2 at 40-46). The notice stated
10  that "you have submitted additional information consisting of records of her treatment
11  for a possible sleep disorder. . . includ[ing] records from Stanford Hospital Sleep Clinic,
12  as well as records from Dr. Inchel Yeam." *Id.* at 40. The Notice included a summary
13  of the medical records submitted by Nelson and the review by a Physician Consultant.
14  The Notice concluded,

15      Ms. Nelson exhausted benefits payable to her for her Mental Disorder as
        of October 16, 2009. Benefit payment has continued to her beyond this
16      time while review of the additional information you submitted, with
        respect to her possible sleep disorder, was completed. This information
17      provided does not support the presence of a physical disease process
        which produces ongoing limitations and restrictions precluding her from
18      performing her Own Occupation. Therefore she does not satisfy either the
        Own Occupation or broader Any Occupation Definition of Disability
19      within the Group Coverage as a result of a condition not otherwise subject
        to limitation and her claim has been closed with payment to her through
20      December 31, 2009.

21  *Id.* at 45-46.

22  On April 26, 2010, Nelson was awarded Social Security benefits beginning
23  January 2009. (ECF No. 69-6 at 6).

24  On November 18, 2010, Nelson requested that Standard reconsider the
25  termination of benefits. (ECF No. 69-6 at 59-61). Nelson stated,

26      I freely admit that I have been depressed because of my illness, my
        inability to work. But my depression is not why I am unable to be
27      gainfully employed. I simply cannot function in any proper fashion
        because of the ongoing and well documented fact that I am suffering from
28      Sleep Apnea, PLMD or some other possible neurological disorder. The
        consultants that Standard has used to review this matter appear to agree

> that the inability to work is sleep apnea, which is a physical problem, not a mental one. I enclose several new letters from my treating physicians who all concur that I suffer from sleep apnea and Periodic Limb Movement disorder and that these are the causes of my ongoing disabilities. I have reviewed the provisions of the policy that you have cited and do not see in any of those provisions that a claim for disability benefits may be denied because of the development of depression or being concerned about the disability itself.

*Id.* at 59. Nelson's request attached articles from medical journals and a letter dated November 10, 2010 from the Chirag Pandya, M.D. Stanford Hospital and Clinics addressed to "To Whom It May Concern." *Id.* at 69. Dr. Pandya wrote that Nelson

> is under our care at the Stanford Sleep Medicine Center for treatment of obstructive sleep apnea syndrome (OSAS). The treatment being utilized in this case is Continuous Positive Air Pressure (CPAP), a device which allows the patient to breathe normally at night without abnormal breathing events and low oxygen levels that were present prior.
>
> On May 23, 2007, the patient underwent an overnight polysomnogram. The findings showed a Respiratory Disturbance Index (RDI) of 12 and low oxygen Saturation of 90. These findings further confirm the clinical complaints of daytime sleepiness, fatigue and snoring. . . . Patient's daytime sleepiness and fatigue are very likely to be due to her OSAS. The patient returned for CPAP triation study on January 23, 2007. The findings show improvement in abnormal breathing events, oxygen levels and arousals compared to the diagnostic sleep study. Therefore CPAP therapy is recommended, even in the setting of mild OSAS.

*Id.* The remainder of the letter is directed at obtaining funds for CPAP.

On November 22, 2010, Standard wrote to Nelson confirming the receipt of the reconsideration letter and notifying Nelson that review was resuming with a referral of "the file to a Sleep Specialist for review." (ECF No. 69-6 at 73).

On Janaury 3, 2011, Douglas T. Brown, a Board certified neurologist, prepared a report for Standard based upon his review Nelson's medical records. Dr. Brown reviewed the Stanford hospital and clinic records, as well as the information from Dr. Black, and Dr. Yeam. In the review questions and answers, Dr. Brown stated in part,

> **What diagnoses are supported by the medical records?**
>
> The diagnoses supported by the medical records are major depressive disorder and mild obstructive sleep apnea. There is no substantiation of any other sleep disorder. . . .
>
> **Describe the claimant's work limitations and restrictions for each diagnosis....**

> I defer to an appropriate specialty regarding the extent to which the claimant may or may not be functionally impaired and require restriction / limitation due to her psychiatric condition. In regard to her obstructive sleep apnea, there are no necessary restrictions or limitations. Essentially there is no documentation of excessive daytime somnolence given that two MSLT's have shown a normal mean sleep latency. There is no documentation of cognitive impairment that is due to her sleep disorder as opposed to being due to her psychiatric disorder. Furthermore, neither severe excessive daytime somnolence nor cognitive impairment of functionally impairing severity would be likely to occur in a patient with obstructive sleep apnea of the mild severity found in this claimant.

(ECF No. 69-6 at 33).

On October 10, 2011, Standard issued its final decision, denying Nelson's long term disability claim after its administrative review unit[2] evaluated the December 31, 2009 decision to close the claim. (ECF No. 69-5 at 132-141). The decision reviewed the background of the claim noting that Nelson's claim was supported by Physician's statements listing the primary diagnosis as "Major Depressive Disorder" and that the claim was approved on the basis of disabling conditions of depression and anxiety. The decision reviewed Nelson's medical history including both her limited condition of depression and non-limited condition of sleep disorders. Standard relied upon the report by its Neurologist Consultant who "found that the diagnoses supported by the medical evidence are major depressive disorder and mild obstructive sleep apnea." *Id.* at 136. Standard noted that the Independent Neurologist found "no documentation of cognitive impairment that is due to her sleep disorder as opposed to being due to her psychiatric disorder." *Id.* Standard concluded

> Overall, we found that Ms. Nelson's self-reported experience of severe daytime sleepiness/fatigue appears to be due to her mental disorder given that her mental disorder; which began as a young child, predates development of her sleep complaints. Her mental disorder appears to be quite severe, involving multiple suicide attempts and inpatient hospitalizations. Major depressive disorders do commonly cause symptoms of sleep disruption, fatigue and subjective hypersomnia as reported by Ms. Nelson.
>
> There is insufficient medical evidence for the substantiation of any organic sleep disorder other than mild obstructive sleep apnea. We did not find that Ms. Nelson's mild OSA is a cause for work limitations or restrictions.

---

[2] The review was "conducted separately from the individuals who made the original claim determination." (ECF No. 69-5 at 132).

. . .

She does not meet the criteria for narcolepsy and no neurological disorder has been found. The only consistently documented sleep disorder is mild OSA. As the Neurologist Physician Consultant explained mild OSA would not cause disabling fatigue or severe ongoing suicidal depression. Rather it appears to be the case that Ms. Nelson has had a life-long history of significant depression with multiple suicidal attempts and psychiatric hospitalizations. These facts cannot be ignored or revised to now assert that Ms. Nelson is not disabled due to a mental disorder, but, is disabled due to a mild sleep disorder. No other sleep disorder has been supported with *anatomical or physiological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.* Although Ms. Nelson has had testing that may have supported another sleep disorder; over time and with medically acceptable clinical and laboratory diagnostic techniques other sleep disorders have not been substantiated.

Based on the medical evidence her mild OSA does not appear to be causing her significant limitations or restrictions from performing work; however, her ongoing severe depression still appears to be disabling.

(ECF No. 69-5 at 138-139).

**Stanford records (1999-2008)**

On August 16, 1999, Dr. Clete Kushida from the UCSF Stanford Sleep Clinic prepared an assessment of Nelson after evaluation. Dr. Kushida detailed Nelson's history of sleep disorders and depression. Dr. Kushida reported Nelson's history to include snoring since childhood, and daytime sleepiness since the age of 10 to 11 years old. Dr. Kushida reported a history of depression and multiple suicides. Dr. Kushida stated,

The patient's symptoms are consistent with a diagnosis of Narcolepsy vs. idiopathic CNS hypersomnia. I also cannot rule out the possibility of the Obstructive Sleep Apnea Syndrome or sleep disorder secondary to a mood disorder at this time. The patient has been scheduled for a nocturnal polysomnogram with esophageal manometry as well as Multiple Sleep Latency Test. The patient understands the risks of driving while sleepy and was advised not to drive under this condition.

(ECF No. 69-8 at 62).

On December 30, 1999, Nelson was seen at the Sleep Disorders Clinic for an initial evaluation by Christian Guilleminault, M.D. Dr. Guilleminault reported

IMPRESSION AND PLAN:
1) The differential diagnosis for the patient's excessive daytime sleepiness includes upper airway resistance syndrome, narcolepsy, idiopathic hypersomnia. The study done in September of 1999 does not corroborate

a history of excessive daytime sleepiness.  The Multiple Sleep Latency Test showed a normal mean sleep latency time.  We will repeat the Multiple Sleep Latency Test with Pes, off Prozac.

2) The patient also gives a history of parasomnias with confusional arousals and sleepwalking.

3) Major depression.  We have suggested that she continue the Prozac after the test and follow up with her psychologist. . . .
The patient will return to clinic three weeks after the polysomnography.

(ECF No. 69-8 at 4).

On January 13, 2000, Nelson underwent a nocturnal polysomnogram with esophgeal manometry.  (ECF No. 69-8 at 6).  Dr. Kushida stated that the study was "consistent with mild sleep related breathing disorder and periodic limb movement disorder.  The multiple sleep latency study was within normal limits."  (ECF No. 69-8 at 17).

On January 24, 2000, Nelson returned to the sleep clinic with symptoms of excessive daytime sleepiness and tiredness.  Anstella Robinson, M.D. wrote "we believe that her symptoms are most likely related to the periodic limb movement disorder." Testing was done and medication was prescribed.  (ECF No. 69-8 at 6).

On February 14, 2000, Nelson underwent a nocturnal polysomnogram for continuous positive airway pressure titration.  Dr. Kushida concluded that the results were "consistent with periodic limb movement and obstructive sleep apnea syndrome that improved with CPCP nasal pressure..."  (ECF No. 69-8 at 24).  Dr. Kushida recommended that Nelson "should use nasal CPAP . . . for at least a month" and have "medical follow up to evaluate the effectiveness of CPAP treatment." *Id.*

On April 25, 2000, Nelson was admitted to the Stanford Hospital with "nasal obstruction and chronic tonsillar Hypertrophy with sleep disorder breathing." (ECF No. 69-9 at 28).  Nelson underwent nasal septoplasty and a tonsillectomy to improve her nasal airway an well as remove her tonsils.  *Id.*

Nelson returned to the Stanford Hospital and Clinic on April 30, 2007. Nelson was seen by Dr. Guilleminault who wrote:

Mrs. Nelson is a 35 year old woman with a history of depression and

anxiety who was initially evaluated at the Stanford Sleep Center in January of 2000 with a complaint of chronic excessive daytime sleepiness and unrefreshing sleep since childhood. . . . The patient states that . . . she moved down to Southern California at which time her primary physician ran multiple tests . . . which revealed her to be most amenable treatment with []. She . . . felt improvement mainly in her daytime functionality and was able to return to work in a more productive way. This improvement lasted for several years but she noted that over the past year her ability to function at work has waned significantly and she is now currently on disability due to significant daytime sleepiness and inability to function.

(ECF No. 69-8 at 9). In the assessment, Dr. Guilleminault stated, "[t]his is a 35-year-old woman with a history of well-controlled depression and anxiety who complains of long-standing sleep disruptions including significant sleep fragmentation, sleep talking and night terrors." *Id.* The assessment included "probable sleep-disordered breathing" and "parasomnias." *Id.*

On May 20, 2007, a complete polysomnogram was performed. (ECF No. 69-8 at 39). Dr. Anstella Robinson, M.D. reported, "This recording is consistent with obstructive sleep apnea." *Id.*

On May 30, 2007, a complete polysomnogram was performed. (ECF No. 69-8 at 45). Dr. Stephen Brooks, M.D. reported, "this recording is consistent with obstructive sleep apnea that improved with CPAP pressure of 6 cm of water." *Id.*

On July 2, 2007, Nelson returned to Stanford Hospital and Clinic. Nelson was evaluated by Stephen Brooks, M.D. for "symptoms of excessive daytime sleepiness and tiredness." (ECF No. 69-8 at 12). Dr. Brooks stated that "her sleepiness, especially in the daytime, is partially a result of her obstructive sleep apnea. I do not think that she has periodic limb movement disorder." *Id.* Nelson was started on a CPAP machine and continued medications. Dr. Brooks stated "if there are no other options, then at a later date we can consider mandibular surgery." *Id.*

On September 4, 2007, Nelson was seen at the Stanford Clinic by Dr. Srivastava and Dr. Solvason for "medical evaluation for treatment of her depression." (ECF No. 69-10 at 2-6). The medical record stated, "patient states she has struggled with sleep-related issues since a very young age." *Id.* The record indicates that since April 2007, Nelson has been "increasingly depressed" and that Nelson was hospitalized for 3 days

approximately two months ago, "due to worsening depression and suicidal ideation." *Id.* at 3. The record indicates that Nelson was "diagnosed with obstructive sleep apnea and has been on CPAP for the past two weeks." The report indicates the following diagnoses: "Major depressive disorder, recurrent/severe with atypical features insomnia not otherwise specified," and "obstructive sleep apnea, status post palatal surgery in April 2000, now on CPAP for 2 weeks." *Id.* at 5. Nelson was to continue medication for depression, continue CPAP and follow up at a sleep clinic, continue psychotherapy, and return to the clinic in three weeks.

On January 8, 2008, Nelson was seen at the Stanford Clinic and "directly admitted" for hospitalization "for her depression." (ECF No. 69-10 at 8). Nelson was discharged on January 22, 2008. The discharge summary noted "history of Major Depressive Disorder and obstructive sleep apnea who was admitted for depression with suicidal ideation." ECF No. 69-10 at 8. Follow-up plans included an appointment at the sleep clinic.

On January 31, 2008, Dr. Buckley at the Stanford Clinic reported:

> Coming back to 2007, recently she came back here for a followup and it was suggested a new diagnostic polysomnogram which showed RDI of 12 with minimal oxygen saturation of 90%; however, no PLMs were observed, therefore, compatible with mild sleep apnea. She was recommended a subsequently CPCP tiration with the use of CPCP at 6 cm of water. The patient did not feel much improvement of symptoms and has been empirically increasing the pressure up to 9 cm of water. The patient has a history of psychiatric disorders, being previously diagnosed with major depressive disorder and recent hospitalization between January 8, 2008 and January 22, 2008, secondary to suicidal plan and ideations. . . . The patient states that she is feeling some partial improvement with the use of CPCP. . . ; however, she still feels mildly sleepy and tired.

(ECF No. 69-8 at 14).

On January 23, 2009, a complete polysomnogram was performed. (ECF No. 69-8 at 52). Dr. Guilleminault, M.D. reported, "this recording is consistent with obstructive sleep apnea that improved with CPAP pressure of 12 cm of water." *Id.*

**Policy Provisions**

Under the Policy the "Group Long Term Disability Insurance Statement Of Coverage" provides, "If you become Disabled while insured under the Group Policy,

we will pay LTD (Long Term Disability) Benefits according to the terms of your Employer's coverage under the Group Policy after we receive Proof of Loss satisfactory to us." (ECF No. 96-5 at 105).

The Policy provides,

> You are Disabled if you meet the following definitions during the periods they apply: . . . A.  Own Occupation Definition Of Disability.  B.  Any Occupation Definition Of Disability. . . . You are disabled from your Own Occupation if, as a result of Physical Disease, Injury, Pregnancy or Mental Disorder: 1.  You are unable to perform with  reasonable continuity the Material Duties of your Own Occupation; and 2) You suffer a loss of at least 20% in your Indexed Predisability Earnings when working in your Own Occupation."  *Id.* at 108-109.  The Policy states: "You are disabled from all occupations if, as a result of Physical Disease, Injury, Pregnancy or Mental Disorder, you are unable to perform with  reasonable continuity the material duties of any occupation.

*Id.* at 109.

The Policy provides,

A.  Mental Disorders, . . . and Other Limited Conditions

> payment of LTD Benefits is limited to 24 months during your entire lifetime for a Disability caused or contributed to by any one or more of the following, or medical or surgical treatment of one or more of the following:  Mental Disorders. . . or . . . Other Limited Conditions. . .
>
> Mental Disorder means any mental, emotional, psychological, personality, cognitive, mood or stress-related abnormality, disorder, disturbance, dysfunction or syndrome, regardless of cause (including any biological or biochemical disorder or imbalance of the brain) or the presence of physical symptoms.   Mental Disorder includes, but is not limited to, bipolar affective disorder, organic brain syndrome, schizophrenia, psychotic illness, manic depressive illness, depression and depressive disorders, anxiety and anxiety disorders.
>
> . . . Other Limited Conditions does not include . . . neurologic diseases...

B.  Rules For Disabilities Subject to Limited Pay Periods

> 1.  If you are Disabled as a result to a Mental Disorder or any Physical Disease or Injury for which payment of LTD Benefits is subject to a limited pay period, and at the same time are Disabled as a result of a Physical Disease, Injury, or Pregnancy that is not subject to such limitation, LTD Benefits will be payable first for conditions that are subject to the limitation.
>
> 2.  No LTD Benefits will be payable after the end of the limited pay period, unless on that date you continue to be Disabled as a result of a Physical Disease, Injury, or Pregnancy for which payment of LTD Benefits is not limited.

1  *Id*. at 118-19.

2      The policy includes the following Claims provision:

3      C. Proof of Loss

4      Proof of Loss means written proof that you are Disabled and entitled to
       LTD benefits.  Proof of Loss must be provided at your expense.

5

6      For claims of Disability due to conditions other than Mental Disorders, we
       may require proof of physical impairment that results from anatomical or
       physiological abnormalities which are demonstrable by medically
7      acceptable clinical and laboratory diagnostic techniques.

8  *Id*. at 120.

9                    **CONTENTIONS OF THE PARTIES**

10      Nelson contends that Standard unreasonably concluded that a mental disorder

11  caused her inability to work. Nelson contends that the evidence shows that her only

12  disabling condition was the various diagnosed sleep disorders. Nelson asserts that her

13  inability to work caused depression but depression is not the cause of her inability to

14  work.  Nelson asserts the record contains no competent opinion that a mental disorder

15  is the cause of her inability to work.

16      Nelson asserts that her sleep disorders beginning at age 6 predated any diagnosis

17  of depression.  Nelson asserts that her sleep disorders are evidenced in the  record by

18  demonstrable physical abnormalities and numerous clinical studies documenting a long

19  history of sleep apnea, restless leg syndrome, narcolepsy, and other sleep disorders.

20  Nelson contends that Standard unreasonably concluded that the mental disorder

21  limitation applied and that she is not entitled to benefits beyond the 24-month period.

22  Nelson further contends that she is entitled to coverage beyond the 24-month period

23  even if there is some involvement of a mental disorder in her inability to work. Nelson

24  asserts that the evidence in the record is overwhelming that documented, diagnosed, and

25  treated sleep disorders are the only or effective cause of her inability to work.

26      Nelson asserts that Defendant Standard abused its discretion by failing to credit

27  the opinions of her treating physicians, by failing to obtain additional information, by

28  failing to obtain a secondary psychiatric opinion, by rejecting her subjective complaints,

1   by rejecting the determination of the Social Security Administration, and by failing to

2   apply the proximate cause doctrine under California law. Nelson contends that

3   Standard's discontinuation of benefits beyond two years was an abuse of discretion, a

4   violation of its fiduciary duties, and unreasonable.  Nelson contends that the Court

5   should order payment of benefits "from December 31, 2009 to the date of the decision."

6   (ECF No. 68-1 at 31).

7        Standard contends that the decision to close Nelson's claim was reasonable and

8   well supported by medical evidence in the record.  Standard asserts that the decision to

9   pay benefits was expressly based on Nelson's depression and anxiety due to long-

10  standing and severe major depressive disorder. Standard asserts that Nelson failed to

11  establish that she was disabled by a condition independent from her Mental Disorders

12  in order to continue to receive benefits after the 24-month limitation period based upon

13  a non-limiting condition. Standard asserts that the medical records from Nelson's

14  treating physicians reflect a diagnosis of mild sleep apnea. Standard asserts that Nelson

15  has failed to provide any medical evidence that any sleep disorder resulted in physical

16  impairment precluding Nelson from performing the material duties of any occupation.

17       Standard asserts that the subsequent award of social security benefits does not

18  establish that Nelson suffers from disabling sleep disorders, and that no physician

19  opined at any time that Nelson had a sleep disorder that foreclosed her ability to work.

20  Standard asserts that it was not an abuse of discretion to rely upon objective testing

21  from Nelson's treating physicians, contemporaneous medical records showing mild

22  sleep apnea, and the opinions of Dr. Herzberg and Dr. Brown to conclude that Nelson's

23  sleep related issues did not render her unable to work.

24                          **ANALYSIS**

25       "In the ERISA context, a motion for summary judgment is merely the conduit to

26  bring the legal question before the district court and the usual tests of summary

27  judgment, such as whether a genuine dispute of material fact exists, do not apply."

28  *Harlick v. Blue Shield of California*, 686 F.3d 699, 706 (9th Cir. 2012), *cert denied*, 133

S.Ct.1492 (2013) (internal quotations omitted).   In *Harlick*, the Court of Appeals explained:

> When we review an ERISA plan administrator's denial of benefits, the standard of review depends on whether the plan explicitly grants the administrator discretion to interpret the plan's terms. *Abatie*, 458 F.3d at 967. The parties agree that Harlick's plan did grant Blue Shield such discretion. We therefore review Blue Shield's decision for abuse of discretion. *Id.* However, our review is "tempered by skepticism" when the plan administrator has a conflict of interest in deciding whether to grant or deny benefits. *Id.* at 959, 968–69. In such cases, the conflict is a "factor" in the abuse of discretion review. *Abatie*, 458 F.3d at 966–68; *accord Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008). The weight of that factor depends on the severity of the conflict. *Abatie*, 458 F.3d at 968; *Glenn*, 554 U.S. at 108, 115–117, 128 S.Ct. 2343.
>
> A conflict arises most frequently where, as here, the same entity makes the coverage decisions and pays for the benefits. This dual role always creates a conflict of interest, *Glenn*, 554 U.S. at 108, 128 S.Ct. 2343, but the conflict is "more important . . . where circumstances suggest a higher likelihood that it affected the benefits decision." *Id.* at 117, 128 S.Ct. 2343. The conflict is less important when the administrator takes "active steps to reduce potential bias and to promote accuracy," *id.*, such as employing a "neutral, independent review process," or segregating employees who make coverage decisions from those who deal with the company's finances. *Abatie*, 458 F.3d at 969 n. 7. The conflict is given more weight if there is a "history of biased claims administration." *Glenn*, 554 U.S. at 117, 128 S.Ct. 2343. Our review of the administrator's decision is also tempered by skepticism if the administrator gave inconsistent reasons for a denial, failed to provide full review of a claim, or failed to follow proper procedures in denying the claim.

*Harlick*, 686 F.3d at 707.

In this case, the Group's Allocation of Authority confers Standard with broad discretionary powers, including "full and exclusive authority to control and manage the Group Policy, to administer claims, and to interpret the Group Policy and resolve all questions arising in the administration, interpretation and application of the Group Policy" and the right to determine "eligibility for insurance," "entitlement to benefits," "the amount of benefits," and the "sufficiency and the amount of information" required to establish eligibility and entitlement to benefits.   (ECF No. 69-5 at 121-22).   The Policy provided that any decision made by Standard "in the exercise of our authority is conclusive and binding."   *Id.*   The Policy contained a clear grant of discretionary authority and the administrator's benefit decision is reviewed for an abuse of discretion.

In this case, Standard is the plan administrator, makes the coverage decisions, and pays benefits. While there is no evidence of a history of bias in claims administration, review for abuse of discretion, is tempered by some skepticism because of the structural conflict. *See Conkright v. Frommert*, 559 U.S. 506, 512 (2010) ("[W]hen the terms of a plan grant discretionary authority to the plan administrator, a deferential standard of review remains appropriate even in the face of a conflict."); *Stephan v. Unum Life Ins. Co. of America*, 697 F.3d 917, 929 (9th Cir. 2012) ("While not altering the standard of review itself, the existence of a conflict of interest is a factor to be considered in determining whether a plan administrator has abused its discretion."). Under the abuse of discretion standard, "a plan administrator's decision will not be disturbed if reasonable. This reasonableness standard requires deference to the administrator's benefits decision unless it is (1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Id.* (internal quotations and citations omitted).

The United States Supreme Court has held that the "courts are to develop a federal common law of rights and obligations under ERISA-regulated plans." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 110 (1989) (internal quotation omitted). "An ERISA plan is a contract that we interpret in an ordinary and popular sense as would a person of average intelligence and experience." *Harlick*, 686 F.3d at 708 (internal quotations omitted). This Court looks "first to the explicit language of the agreement to determine, if possible, the clear intent of the parties." *Id.*[3]

In this case, the Policy provided, "payment of LTD Benefits is limited to 24 months during your entire lifetime for a Disability caused or contributed to by any one

---

[3] State law doctrines of proximate cause and *contra proferentem* are not applicable. *See Maurer v. Reliance Standard Life Insurance*, 500 Fed. Appx. 626 (9th Cir. 2012) (quoting *Winters v. Costco Whole Sale Corp.*, 49 F.3d 550, 554 (9th Cir. 1995) ( "The doctrine of *contra proferentem* does not apply 'where, as here, the Plan grants the fiduciary explicit discretion to interpret the Plan.'")).

or more of the following, or medical or surgical treatment of one or more of the following: Mental Disorders." (ECF No. 69-5 at 118). Nelson initially supported her claim for disability by providing Standard with statements from Justin Birnbaum, M.D., a psychiatrist, and Sheila Tobin Black, Ph.D., a psychologist, who both listed Nelson's diagnosis as "Major Depressive Disorder" with symptoms including difficulty sleeping. (ECF No. 69-2 at 107).

Standard requested medical records from Dr. Black and Stanford Hospital and Clinics and referred Nelson's application to its psychiatrist physician consultant. The consultant concluded that Nelson "has a substantial degree of depression" and that "it is reasonable that Ms. Nelson is unable to function in her own or any other occupation." (ECF No. 69-10 at 101). Standard accepted the claim and notified Nelson that

> [t]he information in your file supports that you are Disabled by one or more conditions, including depression and anxiety. Since depression and anxiety are considered to be mental disorders, we will apply the Mental Disorders Limitation to your claim. . . We will review your claim on an ongoing basis to determine if you are Disabled by other conditions which are not subject to Limitation. If we determine that you are Disabled by other conditions which are not subject to Limitation, you may continue to receive LTD Benefits after the 24 month Maximum Benefit Period for your Limited Condition(s) is over.

(ECF No. 69-2 at 72-73).

The determination that Nelson's inability to work was caused or contributed by her major depressive disorder and that major depressive disorder was a Mental Disorder subject to the 24-month limit under the Policy was reasonable, well-supported by the record, and consistent with the express terms of the Policy. Nelson supported her application under the Policy with statements from a clinical psychologist and a psychiatrist. Both treating physicians offered a diagnosis of major depressive disorder. Nelson's treating physicians agreed that Nelson suffered mental and cognitive limitations from "depressed mood" with "chronic fatigue" and "difficulty sleeping." (ECF No. 69-2 at 107, 128). Both Physician Statements informed Standard that Nelson had been hospitalized from Janaury 8, 2008 until January 22, 2008 at the Stanford

Hospital for "depression with suicidal ideation." (ECF No.69-2 at 107, 128). Even assuming that Nelson's inability to work was contributed to by a non-limited condition, the express terms of the Policy, required Standard to pay benefits first for the limited condition. The Plan provided: "If you are Disabled as a result of a Mental Disorder or any Physical Disease or Injury for which payment of LTD Benefits is subject to a limited pay period, and at the same time are Disabled as a result of a Physical Disease, Injury, or Pregnancy that is not subject to such limitation, LTD Benefits will be payable first for conditions that are subject to the limitation." (ECF No. 69-5 at 119). On July 14, 2008, when Standard accepted Nelson's claim for disability, the medical records provided by Nelson supported the decision that Nelson was disabled by "depression and anxiety" and that "depression and anxiety are considered to be mental disorders" which are limited conditions payable first under the express terms of the Policy. (ECF No. 69-2 at 72-73).

The record shows that Standard received Nelson's medical records from Stanford Hospital and Clinic on December 24, 2008 and undertook to examine whether Nelson was disabled by a non-limited condition under the Policy. Standard referred the file to Dr. Herzberg, physician consultant, on February 15, 2009 to review the records. Standard asked Dr. Herzberg whether the "medical documentation received support that Ms. Nelson has an underlying sleep disorder which is separate and distinct from any sleep issues attributable to her depression." Dr. Herzberg confirmed that Nelson "does have documented obstructive sleep apnea syndrome." Standard asked Dr. Herzberg to address "limitations and restrictions, if any,[] associated with the sleep symptomatology alone." Dr. Herzberg stated, "A fairly high portion of the general population has obstructive sleep apnea syndrome of this severity or greater. . . . For this degree of sleep apnea as documented I do not think there needs to be any associated limitations or restrictions." Standard's follow-up question asked "what would be your recommendation for future medical followup." Dr. Herzberg stated, "Based on how

mild Ms. Nelson's sleep apnea is, I would venture to say that most of her sleep symptoms are referable to her depression and not to her intrinsic sleep disorder. Her change in status will likely follow improved treatment of depression." (ECF No. 69-9 at 43).

At the end of September 2009, Standard received medical records from Dr. Yeam (ECF No. 69-9 at 5) and additional records from Stanford Clinics (ECF No. 69-7at 61). Standard requested a second report from Dr. Herzberg in order to address the additional materials. Dr. Herzberg summarized,

> Ms. Nelson has a complicated sleep history. As recently as Janaury 31, 2008, I can state with confidence through her Stanford evaluation that she does not have narcolepsy nor excessive daytime sleepiness. She does have sleep-disturbed breathing at that point with either upper airway resistance syndrome or mild sleep apnea, depending on the night of her studies, this following her upper airway reconstructive surgery. . . . It would seem likely, given the mild severity of her documented sleep studies to this point, that most of her daytime sleepiness can be attributed to mood disorder with related sleep disorder.

(ECF No. 69-7 at 50).

On January 4, 2010, Standard notified Nelson that she had

> exhausted benefits payable to her for her Mental Disorder as of October 16, 2009. Benefit payment has continued to her beyond this time while review of the additional information you submitted, with respect to her possible sleep disorder, was completed. This information provided does not support the presence of a physical disease process which produces ongoing limitations and restrictions precluding her from performing her Own Occupation. Therefore she does not satisfy either the Own Occupation or broader Any Occupation Definition of Disability within the Group Coverage as a result of a condition not otherwise subject to limitation and her claim has been closed with payment to her through December 31, 2009.

(ECF No. 69-2 at 46).

The Policy provided that "No LTD Benefits will be payable after the end of the limited pay period, unless on that date you continue to be Disabled as a result of a Physical Disease, Injury, or Pregnancy for which payment of LTD Benefits is not limited." (ECF No. 69-5 at 119). Standard had received Nelson's medical records and referred the records to its physician consultant on two occasions. The consultant reports

reviewed the results of the sleep studies conducted at the Standard Sleep Clinic and Pacific Sleep Lab and concluded that Nelson suffered from mild sleep apnea without resulting limitations or restrictions.  This conclusion was consistent with the treating physician records provided by Nelson.  The determination by Standard on January 4, 2010 that the information in the medical records with respect to her sleep disorder does not support the presence of a physical disease process which produces ongoing limitations and restrictions precluding her from performing her Own Occupation was reasonable and supported by the record.

On November 18, 2010, Standard received Nelson's request to review the decision with attached information and referred the case to Dr. Brown for an additional review of records.  Dr. Brown reported that "the diagnoses supported by the medical records are major depressive disorder and mild obstructive sleep apnea.  There is no substantiation of any other sleep disorder."  (ECF No. 69-6 at 33).  Dr. Brown was asked to describe the claimant's work limitations and restrictions for each diagnosis and stated, "In regard to her obstructive sleep apnea, there are no necessary restrictions or limitations.  Essentially there is no documentation of excessive daytime somnolence given that two MSLT's have shown a normal mean sleep latency.  There is no documentation of cognitive impairment that is due to her sleep disorder as opposed to being due to her psychiatric disorder.  Furthermore, neither severe excessive daytime somnolence nor cognitive impairment of functionally impairing severity would be likely to occur in a patient with obstructive sleep apnea of the mild severity found in this claimant."  *Id*.

On October 10, 2011, Standard issued its final decision concluding,

There is insufficient medical evidence for the substantiation of any organic sleep disorder other than mild obstructive sleep apnea.  We did not find that Ms. Nelson's mild OSA is a cause for work limitations or restrictions. . . .

She does not meet the criteria for narcolepsy and no neurological disorder has been found.  The only consistently documented sleep disorder is mild OSA.  As the Neurologist Physician Consultant explained mild OSA

would not cause disabling fatigue or severe ongoing suicidal depression. Rather it appears to be the case that Ms. Nelson has had a life-long history of significant depression with multiple suicidal attempts and psychiatric hospitalizations. These facts cannot be ignored or revised to now assert that Ms. Nelson is not disabled due to a mental disorder, but, is disabled due to a mild sleep disorder. No other sleep disorder has been supported with *anatomical or physiological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.* Although Ms. Nelson has had testing that may have supported another sleep disorder; over time and with medically acceptable clinical and laboratory diagnostic techniques other sleep disorders have not been substantiated.

Based on the medical evidence her mild OSA does not appear to be causing her significant limitations or restrictions from performing work; however, her ongoing severe depression still appears to be disabling.

(ECF No. 69-5 at 138-139).

Under the Policy provisions, Standard was entitled to require Nelson to provide "proof of physical impairment that results from anatomical or physiological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques" in order to continue benefits beyond the 24-month period. (ECF No. 96-5 at 120). Nelson provided statements from Dr. Black, a psychologist, who was seeing Nelson every Tuesday at the time she applied to Standard for disability. Dr. Black provided the diagnosis of major depressive disorder and stated "at times she'll become so sleep deprived that the depression gets really bad and she becomes suicidal." (ECF No. 69-4 at 106). Dr. Black was a psychologist treating Nelson for major depressive disorder who relied upon the Stanford treatment for any diagnosis of sleep disorder. The report of Dr. Black does not provide evidence of a "physical impairment that results from anatomical or physiological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." (ECF No. 96-5 at 120).

The Stanford Hospital and Clinic records provided by Nelson established that she suffered from Obstructive Sleep Apnea. Standard's examining physicians agreed and characterize the condition as mild without functional restriction or limitation. The Stanford records do not provide medical evidence to the contrary. On January 13, 2000,

Dr. Kushida reviewed the nocturnal polysomnogram concluding that the study was "consistent with mild sleep related breathing disorder." (ECF No. 69-8 at 17). On February 14, 2000, Dr. Kushida concluded that the results of another nocturnal polysomnogram were "consistent with periodic limb movement disorder and obstructive sleep apnea that improved with CPAP. . .." (ECF No. 69-8 at 24).

Seven years later, on April 30, 2007, when Nelson returned to the Stanford Sleep Clinic, Dr. Guilleminault described Nelson as a patient with "a history of well-controlled depression and anxiety who complains of long-standing sleep disruptions." (ECF No.69-8 at 9). Nocturnal polysomnogram in May 2007 were reported to be "consistent with obstructive sleep apnea that improved with CPAP. . ." (ECF No.69-8 at 39). At a July 2007 visit, Dr. Brooks concluded "[b]ased on the current polysomnogram test and the CPAP triation study, we believe that her sleepiness, especially in the daytime, is partially as a result of her obstructive sleep apnea. I do not think that she has periodic limb movement disorder." (ECF No. 69-8 at 12). On January 31, 2008, Dr. Buckley at the Stanford Clinic reported, "she came back here for a followup and it was suggested a new diagnostic polysomnogram which showed RDI of 12 with minimal oxygen saturation of 90%; however, no PLMs were observed, therefore, compatible with mild sleep apnea." (ECF No.69-8 at 14). On Janaury 23, 2009, Nelson completed another nocturnal polysomnogram with Dr. Guilleminault concluding the results were "consistent with obstructive sleep apnea that improved with CPAP." (ECF No. 69-8 at 52).

The only additional record provided by Nelson was the evaluation by Dr. Yeam on August 3, 2009. Dr. Yeam concluded his impression as "Probable Narcolepsy. Parasommnia" and recommended "further clinical evaluation." (ECF No. 69-9 at 1).

The medical records establish that Nelson suffered from obstructive sleep apnea and establish that Nelson did not suffer from Narcolepsy or Periodic Limb Movement. Based upon the reports of Nelson's treating physicians, it was reasonable fore Standard

to rely upon the conclusions of Dr. Herzberg and Dr. Brown to determine that the medical evidence did not substantiate "any organic sleep disorder other than mild sleep apnea" and the mild sleep apnea did not cause work limitations or restrictions.  (ECF No. 69-5 at 138).

The Social Security determination in this case does not support a different conclusion.  On October 16, 2009, Nelson applied for social security benefits describing the conditions that limit her ability to work as "sleep apnea, periodic limb movement disorder, restless leg syndrome, narcolepsy, depression."  (ECF No. 69-13 at 23).  The record shows that Nelson received an award of disability benefits but does not indicate the disability relied upon to support the award.  Because the records show that Nelson had a disabling mental disorder, this determination by Social Security does not support the conclusion that Nelson had a disabling sleep disorder.

The Court concludes that Standard did not abuse its discretion by determining that Nelson was not entitled to disability benefits payments under the Policy for a non-limited condition after December 31, 2009.  Standard reasonably relied upon specific provisions of the policy, objective testing from Nelson's treating physicians, medical records from treating physicians showing mild sleep apnea, and the opinions of Dr. Herzberg and Dr. Brown consistent with the medical records provided by Nelson.  No treating physician report in the record opined that Nelson's sleep disorders were disabling.  *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003) ("Nothing in [ERISA] suggests that plan administrators must accord special deference to the opinions of treating physicians.").

The Court has taken into consideration Standard's dual role as claims administrator and insurer.  This structural conflict is offset by Standard's efforts to consult three different medical professionals and Standard's decision to conduct reconsideration review by individuals not involved in the disability determination.  *See Harlick*, 686 F.3d at 707 ("The conflict is less important when the administrator takes

1   'active steps to reduce potential bias and to promote accuracy,' such as employing a

2   'neutral, independent review process,' or segregating employees who make coverage

3   decisions from those who deal with the company's finances."). Even applying a high

4   degree of skepticism, the Court concludes that decision by Standard to limit benefits

5   was reasonable based upon the express language of the Policy and the medical records.

6   Standard provided full review of the claim and followed proper procedures in

7   determining the claim.

8                              **CONCLUSION**

9        IT IS HEREBY ORDERED that 1) motion for summary judgment and judicial

10   notice (ECF No. 68) filed by Plaintiff Mariana Nelson is denied; and 2) motion for

11   summary judgment (ECF No. 69) filed by Defendant Countrywide Financial

12   Corporation Group Long Term Disability Plan is granted. The Clerk of the Court shall

13   enter judgment in favor of the Defendants and against Plaintiff.

14   DATED:  January 13, 2016

15                                    _William Q. Hayes_

16                              **WILLIAM Q. HAYES**
                              United States District Judge

17

18

19

20

21

22

23

24

25

26

27

28